Alex R. Straus (SBN 321366)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
astraus@milberg.com
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: 917-471-1894
Facsimile:  865-522-0049

*Attorneys for PlaintiffAdditional attorneys on Signature Page*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAHMOOD DAWOOD on behalf of himself and all other similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>NATIONAL PUBLIC RADIO, INC.,<br><br>*Defendant*. | Case No.:<br><br>**CLASS ACTION COMPLAINT:**<br><br>**1. VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mahmood Dawood, on behalf of himself and all others similarly situated, files this Complaint against Defendant National Public Radio, Inc. ("NPR" or "Defendant") for violation of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. ("Facebook"), data containing its digital subscribers' (i) personally identifiable information or Facebook ID ("FID") and (ii) the computer file containing video and its corresponding URL viewed ("Video Media") (collectively, "Personal Viewing Information"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## **NATURE OF THE ACTION**

1.      This is a consumer digital privacy class action complaint against NPR for violating the VPPA by disclosing its digital subscribers' identities and Video Media to Facebook without the proper consent.

2.      The VPPA prohibits "video tape service providers," such as NPR, from knowingly disclosing consumers' personally identifiable information, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without express consent in a stand-alone consent form.

3.      Like other businesses with an online presence, Defendant collects and shares the personal information of visitors to its website and mobile application ("App") with third parties. Defendant does this through cookies, software development kits ("SDK"), and pixels. In other words, NPR's digital subscribers have their personal information disclosed to Defendant's third-party business partners.

4.      The Facebook pixel is a code Defendant installed on its website allowing it to collect subscribers' data. More specifically, it tracks when digital subscribers enter NPR's website (www.npr.org) or App and view Video Media. NPR's website tracks and discloses to Facebook the digital subscribers' viewed Video Media, and most notably, the digital subscribers' FID. This occurs even when the digital subscriber has not shared (nor consented to share) such information.

5.      Importantly, Defendant shares the Personal Viewing Information—i.e., digital subscribers' unique FID and video content viewed—together as one data point to Facebook. Because the digital subscriber's FID uniquely identifies an individual's Facebook subscriber account, Facebook—or any other ordinary person—can use it to quickly and easily locate, access, and view digital subscribers' corresponding Facebook profile. Put simply, the pixel allows Facebook to know what Video Media one of its subscribers viewed on NPR's website or App.

6.      Thus, without telling its digital subscribers, Defendant profits handsomely from its unauthorized disclosure of its digital subscribers' Personal Viewing Information

to Facebook. It does so at the expense of its digital subscribers' privacy and their statutory rights under the VPPA.

7.    Because NPR's digital subscribers are not informed about this dissemination of their Personal Viewing Information – indeed, it is automatic and invisible – they cannot exercise reasonable judgment to defend themselves against the highly personal ways NPR has used and continues to use data it has about them to make money for itself.

8.    Defendant chose to disregard Plaintiff's and hundreds of thousands of other NPR digital subscribers' statutorily protected privacy rights by releasing their sensitive data to Facebook. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to Defendant's practices of intentionally disclosing its digital subscribers' Personal Viewing Information to Facebook in knowing violation of VPPA.

## **JURISDICTION AND VENUE**

9.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

10.    This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

11.    Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because Defendant does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District.

## **THE PARTIES**

12.    Plaintiff Mahmood Dawood is an adult citizen of the state of California and is domiciled in Lodi, California. Plaintiff was an NPR digital subscriber in 2019 and had an active Facebook account from 2009 to February 2022. During the relevant time period, Plaintiff Dawood used his NPR digital subscription to view Video Media through NPR's website and/or App while logged into his Facebook account. By doing so, Plaintiff's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Plaintiff never gave Defendant express written consent to disclose his Personal Viewing Information.

13.    Defendant National Public Radio, Inc. is a privately and publicly funded non-profit media organization with over 34.7 million active subscribers throughout the United States. NPR is incorporated in the District of Columbia, and its NPR West location is based in Culver City, California. NPR produces and syndicates radio programming to 900 independently operated noncommercial radio stations, including about 750 NPR member stations throughout the United States. NPR's website is the 200th most-visited website in the U.S., and approximately 85% of the website's subscribers are located in the

U.S. NPR's annual revenue is $283 million. NPR produces and distributes news and cultural programming on its website, including various video content, such as "Tiny Desk" concerts (an NPR music video production), live music sessions, life press conferences and more. As detailed below, Defendant—through its website and App—delivers and, indeed, is in the business of delivering, countless hours of video content to its digital subscribers.

## FACTUAL ALLEGATIONS

### A.   Background of the Video Privacy Protection Act

14.   The VPPA generally prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief and attorney's fees.

15.   The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

16.     Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

18.     While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the

21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

19.    In this case, Defendant chose to deprive Plaintiff and the Class members of that right by systematically disclosing their Personal Viewing Information to Facebook, without providing notice to (let alone obtaining consent from) anyone, as explained herein.

**B.    NPR's Subscriptions**

20.    NPR operates a website in the U.S. accessible from a desktop and mobile device at NPR.org. It also offers an App available for download on Android and iPhone devices.

21.    NPR, through its website and App, allows individual users to subscribe to Daily News Emails, the Best of NPR Newsletter, and customized content (podcasts, health newsletters, Tiny Desk Concerts, etc.).

---

[1] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the21stcentury (last accessed March 15, 2022).

22.    On information and belief, all digital subscribers provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

23.    Digital subscribers may provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.



Figure 1. NPR's website and App prompt subscribers to sign-in/register before viewing online content.

24.     As depicted in Figure 1 above, NPR's website and App gives subscribers the option to sign-in/register before viewing online content. At sign-in, however, subscribers are not informed that their viewing information and FID will be shared with Facebook, nor are they asked to consent to share such information.

25.     Subscribers are only told in tiny letters at the bottom of the sign-in screen that by signing in or registering, they are agreeing to NPR's Terms of Use, Privacy Policy, and that NPR may share the users' name and email address with their NPR station. However, nowhere in NPR's Terms of Use, nor in its Privacy Policy does it state that NPR will share such information with Facebook. Moreover, users who sign in to NPR via Facebook and watch a video are not provided with any notification that their viewing information and FID are being shared.

**C.    Defendant Admits It Collects and Discloses Certain Personal Information of Digital Subscribers to Third Parties But Fails to Advise It Discloses Personal Viewing Information, as Required Under the VPPA.**

26.     The operative Privacy Policy for NPR's website and App mentions that users who "use tools on our Services that allow you to share stories or other content with your friends and followers on an SNS such as Facebook... that action and any information you share may be used by the SNS according to its own privacy policy." However, NPR is sharing with Facebook what its viewers have watched and their FIDs' even when they have not shared (nor have consented to share) such information.

27.    Importantly, once a digital subscriber signs in and watches NPR Video Media, the digital subscriber is not provided with any notification that their Personal Viewing Information is being shared. Similarly, Defendant also fails to obtain digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

**D.    How NPR Disseminates Digital Subscribers' Personal Viewing Information**

**1.    Tracking Pixels**

28.    Websites and apps use Facebook's pixel and SDK to collect information about subscriber's devices and activities and send that to Facebook. Facebook then uses that information to show the subscriber targeted ads.

29.    The Facebook tracking pixel, also known as a "tag" or "web beacon" among other names, is an invisible tool that tracks consumers' actions on Facebook advertisers' websites and reports them to Facebook. It is a version of the social plugin that gets "rendered" with code from Facebook. To obtain the code for the pixel, the website advertiser tells Facebook which website events it wants to track (e.g., Video Media) and Facebook returns corresponding Facebook pixel code for the advertiser to incorporate into its website.

30.    Defendant installed the Facebook tracking pixel, which enables it to disclose Plaintiff's and Class Members' Personal Viewing Information to Facebook,

because it benefits financially from the advertising and information services that stem from use of the pixel. When a digital subscriber enters NPR's website and watches Video Media, the website sends certain information about the viewer, including, but not limited to, their identity and the media content the digital subscriber watched. Specifically, NPR sends Facebook the video content name, its URL, and, most notably, the viewers' Facebook ID.

### 2. Facebook ID ("FID")

31.    A FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the subscriber's Facebook profile and name. When a Facebook subscriber with one or more personally identifiable FID cookies on their browser views Video Media from NPR on its website or App, NPR, through its website code, causes the digital subscriber's identity and viewed Video Media to be transmitted to Facebook by the subscriber's browser. This transmission is not the digital subscriber's decision, but results from Defendant's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code into NPR's website or App. Defendant could easily program the website and App so that this information is not automatically transmitted to Facebook when a subscriber views Video Media. However, it is not Defendant's financial interest to do so because it benefits financially by providing this highly sought-after information.

32.    Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the digital subscribers—any ordinary person could learn the identity of the digital subscriber and the specific video or media content they requested on NPR's website.

33.    At all relevant times, Defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the pixel, including that it enabled NPR's website and App to show targeted advertising to its digital subscribers based on the products those digital subscribers had previously viewed on the website or App, including Video Media purchases, for which Defendant received financial remuneration.

**E.    NPR Unlawfully Discloses Its Digital Subscribers' Personal Viewing Information to Facebook**

34.    Defendant maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the Video Media that each of its digital subscribers viewed.

35.     Defendant is not sharing anonymized, non-personally identifiable data with Facebook. To the contrary, the data it discloses is tied to unique identifiers that track specific Facebook subscribers. Importantly, the recipient of the Personal Viewing Information—Facebook—*receives the Personal Viewing Information as one data point*. Defendant has thus monetized its database by disclosing its digital subscribers' Personal Viewing Information to Facebook in a manner allowing it to make a direct connection—without the consent of its digital subscribers and to the detriment of their legally protected privacy rights.

36.     Critically, the Personal Viewing Information Defendant discloses to Facebook allows Facebook to build from scratch or cross-reference and add to the data it already has in their own detailed profiles for its own subscribers, adding to its trove of personally identifiable data.

37.     These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, a subscriber visits NPR's website and clicks on "music news." The subscriber is then brought to a page that displays articles relevant to their search. Among the relevant articles, the subscriber sees and subsequently clicks on an article titled "How A Joke TikTok About Country Music Stereotypes Hit The Radio."



1
2
3
4
5
6
7
8
9
10

*Pictured above: The article titled "How A Joke TikTok About Country Music Stereotypes Hit The Radio"*
*(taken from NPR's website in September of 2021).*

11    38.    As demonstrated below, once the subscriber clicks on and watches the

12   video in the article, NPR sends the content name of the video the digital subscriber

13   watched, the URL, and the digital subscriber's FID to Facebook.

14

15
16
17
18
19
20
21
22
23
24
25
26
27
28

METHOD: GET +

URL

+ https://www.facebook.com/tr/?id=1621557368158968&
ageView&dl=https%3A%2F%2Fwww.npr.org%2F2021%2F08%2F
10&2537457%2Fbeer-beer-truck-truck-tiktok-sound-hit
-radio&rl=https%3A%2F%2Flogin.npr.org%2F&if=false&t
96323844508&sw=1536&sh=864&v=2.9.44&r=stable&ec=9&o=
p=fb.1.1629632264066.634577810&it=1629632293731&coo
e&rqm=GET

HEADERS

+ accept:                image/avif,image/webp,image/apng
                          e/svg+xml,image/*,*/*;q=0.8
+ accept-              gzip, deflate, br
  encoding:
+ accept-              en-US,en;q=0.9
  language:
+ connection:          keep-alive
+ cookie:              sb=QSYiYalyDwjYI6rQNkC3a1mk;
                          datr=QSYiYVC85DiamULjOSfxaqg8;
                          dpr=1.25; c_user=1175294866;
                          spin=r.100&289719_b.trunk_t.1629
                          4_s.1_v.2_;
                          xs=48%3A3FkHDBcXoLJ1Tg%3A2%3A162
                          21%3A-
                          1%3A15160%3A3%3AAcXXzVWgrYBt_uvzi
                          tM8z_HOM-JB6wRAONlGA;
                          fr=1So81N3XiySO0qSy8.AWWaqOIEqa4

1
2
3
4
5
6
7
8
9

*HTTP single communication session sent from the device to Facebook, reveals the video name, URL and the viewer's FID*

10

11      39.    As a result of Defendant's data compiling and sharing practices, Defendant

12   has knowingly disclosed to Facebook for its own personal profit the Personal Viewing

13   Information of Defendant's digital subscribers, together with additional sensitive personal

14   information.

15

16

17      40.    Defendant does not seek its digital subscribers' prior written consent to the

18   disclosure of their Personal Viewing Information (in writing or otherwise) and its

19   customers remain unaware that their Personal Viewing Information and other sensitive

20   data is being disclosed to Facebook.

21

22      41.    By disclosing its digital subscribers Personal Viewing Information to

23   Facebook—which undeniably reveals their identity and the specific video materials they

24   requested from Defendant's website —Defendant has intentionally and knowingly

25   violated the VPPA.

26

27

28      **F.    Disclosing Personal Viewing Information is Not Necessary**

42.     Tracking pixels is not necessary for NPR to operate its website, digital news publications, or sign-up digital subscriptions. They are deployed on Defendant's website for the sole purpose of enriching Defendant and Facebook.

43.     Even if an on-line news publication found it useful to integrate Facebook tracking pixels, Defendant is not required to disclose Personal Viewing Information to Facebook. In any event, if Defendant wanted to do so, it must first comply with the strict requirements of VPPA, which it failed to do. As noted above, even Facebook forbids the disclosure of such information without first complying specifically with the VPPA (and relevant state laws).

### G.    Plaintiff's Experiences

44.     Plaintiff Mahmood Dawood started using NPR's website to view videos and related content in 2019. Plaintiff became a digital subscriber of NPR's website by providing, among other information, his name, email address, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device.

45.     Plaintiff no longer has an active Facebook account, but, in the past, he regularly used his Facebook account to sign into NPR's website. During that time, Plaintiff viewed Video Media via NPR's website and App, approximately 2-3 times per week.

46.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to Facebook.

47.    Because Plaintiff is entitled by law to privacy in his Personal Viewing Information, Defendant's disclosure of his Personal Viewing Information deprived Plaintiff of the full set of benefits to which he was entitled as part of being an NPR digital subscriber. Plaintiff did not discover that Defendant disclosed his Personal Viewing Information to Facebook until March 2022.

## I.    CLASS ACTION ALLEGATIONS

48.    Plaintiff brings this action on behalf of himself and all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons in the United States with a digital subscription to an online website owned and/or operated by Defendant that had their Personal Viewing Information disclosed to Facebook by Defendant.

49.    Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity

in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

50.    <u>Numerosity.</u> Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are hundreds of thousands of members of the Class widely dispersed throughout the United States. Class members can be identified from Defendant's records and non-party Facebook's records.

51.    <u>Typicality.</u> Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendant in that Defendant caused Personal Viewing Information to be disclosed to Facebook without obtaining express written consent. His claims are based on the same legal theories as the claims of other Class members.

52.    <u>Adequacy.</u> Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

53.    <u>Commonality.</u> Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally

applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

(a)     Whether Defendant knowingly disclosed Class members' Personal Viewing Information to Facebook;

(b)     Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

(c)     Whether Defendant's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

(d)     Whether Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

(e)     Whether the Class is entitled to damages as a result of Defendant's conduct.

54.     Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding

through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## II.    CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710**

55.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

56.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

57.    As defined in 18 U.S.C. §2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

58.    Defendant is a "video tape service provider" as defined in 18 U.S.C. §2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

59.    As defined in 18 U.S.C. §2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

60.    Defendant knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiff and Class members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. §2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed NPR's Video Media, including the specific video materials requested from the website.

61.    As defined in 18 U.S.C. §2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff subscribed to a digital NPR plan that provides Video Media content to the digital subscriber's desktop, tablet, and mobile device. Plaintiff is thus a "consumer" under this definition.

62.    As set forth in 18 U.S.C. §27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or

financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

63.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

64.    Defendant knew that these disclosures identified Plaintiff and Class members to Facebook. Defendant also knew that Plaintiff's and Class members' Personal Viewing Information was disclosed to Facebook because, inter alia, Defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscribers' FID.

65.    By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. See 18 U.S.C. § 2710(c).

66.    As a result of the above violations, Defendant is liable to the Plaintiff and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per

plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## III.    RELIEF REQUESTED

67.    Accordingly, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court:

(a)    Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class;

(b)    For an order declaring that Defendant's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

(c)    For Defendant to pay $2,500.00 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(d)    For punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

(e)    For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

## IV.    JURY DEMAND

68.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all issues so triable.


Dated: April 1, 2022                      Respectfully Submitted,
                                          */s/ Alex R. Straus*
                                          Alex R. Straus (SBN 321366)
                                          **MILBERG COLEMAN BRYSON
                                          PHILLIPS GROSSMAN PLLC**
                                          280 S. Beverly Drive
                                          Beverly Hills, CA 90212
                                          T:     917-441-1894
                                          astraus@milberg.com

                                          Gary M. Klinger*
                                          **MILBERG COLEMAN BRYSON
                                          PHILLIPS GROSSMAN, PLLC**
                                          227 W. Monroe Street, Suite 2100
                                          Chicago, Illinois 60606
                                          Telephone: (847) 208-4585
                                          gklinger@milberg.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Alexandra M. Honeycutt*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865)-247-0080
ahoneycutt@milberg.com

Katrina Carroll*
**LYNCH CARPENTER, LLP**
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
Telephone: (312) 750-1265
katrina@lcllp.com

Jonathan M. Jagher*
**FREED KANNER LONDON &
MILLEN LLC**
923 Fayette Street
Conshohocken, Pennsylvania 19428
Telephone: (610) 234-6487
Facsimile: (224) 632-4521
jjagher@fklmlaw.com

*Pro Hac Vice Forthcoming*

1

## CERTIFICATE OF SERVICE

2

3        I hereby certify that on April 1, 2022, the foregoing document was filed

4    electronically on the CM/ECF system, which caused all CM/ECF participants to be

5    served by electronic means.

6

7                                    **MILBERG COLEMAN BRYSON**
                                    **PHILLIPS GROSSMAN PLLC**
8

9                                    By: */s/ Alex R. Straus*
                                         Alex R. Straus
10

11                                   *Attorney for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28